Case 1:20-cr-00235-CMH   Document 13   Filed 09/30/20   Page 1 of 20 PageID# 65



FILED
IN OPEN COURT

SEP 3 0 2020

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>SETH MICHAEL MYERS,<br><br>        Defendant. | Criminal No. 1:20cr235<br><br>Count 1: Conspiracy To Receive Health Care Kickbacks (18 U.S.C. § 371) |

## STATEMENT OF FACTS

The United States and the defendant, SETH MICHAEL MYERS ("MYERS"), stipulate that the allegations in the Criminal Information and the following facts are true and correct. The United States and MYERS further stipulate that had the matter gone to trial, the United States would have proven the allegations in the Criminal Information and the following facts beyond a reasonable doubt.

### General Allegations

1.      SETH MYERS is a licensed attorney who has worked in various industries including factoring, a type of debtor finance where a business sells its accounts receivable to a third party at a discount.

2.      In 2008, MYERS was approached about a business opportunity by DR. ███████████████████ MYERS's friend and a physician specializing in orthopedic surgery, spine surgery, physical therapy, and comprehensive pain management services who owned a medical practice called ███████████████████ ███ has offices in Maryland and in the Eastern District of Virginia. ████ requested that MYERS work for him and another physician who wanted to become involved in the factoring industry.

1

1

3. MYERS helped ▅▅▅ and his partner set up two companies – one which was a factoring business and another business that bought medical devices and sold them to hospitals as a third-party billing party. MYERS began working for the companies part-time and was paid a salary.

4. The partnership between ▅▅▅ and the other doctor was short-lived. MYERS ultimately began to work for ▅▅▅ full-time. Although MYERS was a licensed attorney, he only acted as an attorney regarding employment agreements, staffing issues, incorporating businesses, and leases and did not provide legal advice about ▅▅▅ business arrangements.

5. After the partnership between ▅▅▅ and the other doctor dissolved, ▅▅▅ created another company with his brother, T.R., which was called Mediplant Funding that performed factoring and third party billing. MYERS also managed another company ▅▅▅ owned called Mid-America Medical Supply, LLC, which sold medical supplies.

6. ▅▅▅ then approached MYERS about a Physician Owned Distributorship ("POD") that ▅▅▅ was a member of called ▅▅▅. PODs derive revenue from, among other things, selling, or arranging for the sale of, implantable medical devices ordered by their physician-owners for use in procedures the physician-owners perform on patients at hospitals or surgical centers. Some of the other members of the ▅▅▅ POD included T.R., Dr. J.A., and Dr. R.D.

7. The purpose of ▅▅▅ was to purchase spine implants from manufacturers at a discounted price and then sell the implants to hospitals. ▅▅▅ would purchase medical devices from Mid-America Medical and then re-sell the devices to hospitals. As a result, ▅▅▅ profited from the transactions twice. ▅▅▅ also concealed his involvement in Mid-America Medical from the doctors in the POD because ▅▅▅ was

2

concerned the doctors in the POD would not do business with Mid-America Medical if they knew about ▉ control over the company.

8.  ▉ also had the idea to form a company called Laboratory RX, LLC ("LABRX") to market items to other medical practices that had in-office pharmacies. LABRX also performed in-office urinalysis testing and offered genetic testing through a third party. While MYERS was listed as the President and sole owner at LABRX, ▉ controlled LABRX. Indeed, ▉ made clear to MYERS that MYERS was not allowed to use any of the money associated with the company. No decisions about LABRX were made without ▉ approval.

9.  At one point during the business relationship an "Ownership Chart" was created listing the businesses which ▉ controlled or owned. The chart listed at least fourteen businesses. While the chart listed LABRX under MYERS' name, MYERS understood that all of the money associated with LABRX belonged to ▉

### The Conspiracy to Violate the Anti-Kickback Statute

10. From in and around spring 2013 and continuing through at least mid-2016, in the Eastern District of Virginia and elsewhere, MYERS knowingly and willfully did combine, conspire, confederate and agree with ▉ MICHAEL BEATTY, MOHAMED ABDALLA and others known and unknown to the Government to commit the following offense against the United States: violating Title 42, United States Code, Section 1320a-7b(b)(1)(A), by knowingly and willfully soliciting or receiving remuneration in return for referring patients to specific pharmacies for the furnishing, and/or arranging for the furnishing, of items and services for which payment was made, in whole or in part, under a Federal health care program, namely TRICARE.

3

11. ▆▆▆ and MYERS eventually used LABRX as a vehicle to profit off of compound prescriptions. Compounding a prescription is a practice in which a licensed pharmacist or licensed physician combine mixed or altered ingredients of a drug or multiple drugs to create a drug tailored to the needs of an individual patient where standard medications, approved by the United States Food and Drug Administration ("FDA"), are unsuitable due to patient allergies, intolerance to method of administration, or other uncommon factors. Compounded medications are prescribed and mixed for specific patients with particular needs; they are not to be mixed and marketed in bulk quantities. Compounded drugs are not FDA-approved. That is, the FDA does not verify the safety, potency, effectiveness or manufacturing quality of compounded drugs.

12. Compounded drugs are far more expensive than drugs approved by the FDA for the treatment of the same physical condition and are commonly reimbursed by federal health care programs and private insurance companies at a far higher rate than FDA-approved drugs.

13. ▆▆▆ and MYERS knew at the time that many health insurance programs were paying pharmacies large amounts of money for compounds at the time, but that TRICARE generally paid the most.

14. TRICARE is a health insurance program of the United States Department of Defense. TRICARE provides civilian health insurance benefits for military personnel, military retirees, reservists, and military dependents all around the world. There are two types of beneficiaries under the TRICARE program: (a) Sponsors – active duty, retired and guard/reserve members; and (b) Family Members – spouses and children who are registered in the Defense Enrollment Eligibility Reporting System ("DEERS").

15. In order to pay a claim, TRICARE requires that the item or service being billed

4

must be medically necessary, properly prescribed by a licensed physician, and actually provided to a TRICARE beneficiary.

16. 32 CFR Part 199 regulates the TRICARE program. 32 CFR § 199.9(c)(12) defines fraud as, among other things, "[a]rrangements by providers with employees, independent contractors, suppliers, or others which appear to be designed primarily to overcharge the [Civilian Health and Medical Program of the Uniformed Services] through various means (such as commissions, fee-splitting, and kickbacks) used to divert or conceal improper or unnecessary costs or profits." TRICARE considers a claim resulting from a violation of 32 CFR § 199.9 as false and TRICARE would not pay for these items or services.

17. TRICARE is a Federal health care benefit program as defined by Title, 18, United States Code, Section 24(b), and as such it is illegal for an individual to pay kickbacks to a person for the referral of an individual for the furnishing of some health care item, benefit, or service.

**Conspiracy with Fallston Pharmacy**

18. In or around late spring or early summer of 2013, ▇▇▇▇ approached an individual named MICHAEL BEATTY about an arrangement to receive kickback payments for compound prescription referrals. BEATTY was an owner of FALLSTON PHARMACY ("FALLSTON) located in Fallston, Maryland. After initially brokering the kickback deal with BEATTY, ▇▇▇▇ sent MYERS to meet with BEATTY to set up the agreement to send prescriptions to FALLSTON in exchange for commissions. On or around July 9, 2013, ▇▇▇▇ BEATTY, and MYERS met at a restaurant in Baltimore, Maryland to discuss the arrangement.

19. In order to disguise the bribe and kickback payments, BEATTY and MYERS created a sham business arrangement to promote the appearance that FALLSTON PHARMACY

5

was paying for legitimate services, rather than for the acts of prescribing and referring compounded drug prescriptions.

20. Specifically, following the meeting at the Baltimore restaurant, MYERS approached BEATTY with a document titled, Area Manager Agreement (Independent Contractor). Pursuant to this agreement, MYERS agreed to provide "marketing" services for FALLSTON PHARMACY in exchange for fees. MYERS agreed to "devote such time, energy and skill on a regular and consistent basis as is necessary to solicit orders and promote the sale of Fallston Pharmacy's products." In exchange, BEATTY agreed to provide LABRX, "50% of the sales on all products sold to customers by the Area Manager . . . and 50% on all products sold by his/her subordinate marketing representatives." MYERS and BEATTY executed this agreement in July of 2013. Prior to working with Fallston Pharmacy, ▇▇▇ and MYERS had similar agreements with other pharmacies in Nevada, but ▇▇▇ and MYERS ultimately used FALLSTON PHARMACY exclusively because other pharmacies paid less than 50 percent of the profits for the referrals.

21. MYERS understood that the agreement was for the referral of prescriptions and for unlawful kickbacks paid for these prescriptions. While the arrangement was documented as a "marketing agreement," little to no marketing was performed. ▇▇▇ MYERS, and BEATTY discussed very little related to marketing plans or proposed marketing ideas. According to MYERS, it was made clear to BEATTY that the marketing agreement was only for ▇▇▇ to refer prescriptions to FALLSTON PHARMACY and that any "marketing fees" or "commissions" were payments to ▇▇▇ for sending compound prescriptions to the pharmacy.

22. In order to further the arrangement, BEATTY developed potential compounded formulas and investigated whether insurance companies would pay for those formulas. BEATTY

6

told ▓▓▓ the compound formulas that received the best reimbursements and the medical conditions for which the compounds could be used. The goal was then for ▓▓▓ to prescribe to his patients the compounds that reimbursed at the highest amounts. ▓▓▓ was already aware of some of these high-reimbursing compounds because he provided some of these formulas to BEATTY.

23. MYERS coordinated having pre-printed prescription pads made that listed lucrative compound formulas and provided them to ▓▓▓ for ▓▓▓ to use. The co-conspirators generally tried to include the drug "ketamine" in a prescription because of the high reimbursement value.

24. Pursuant to the scheme, patients were not given the option to use other pharmacies because the office staff at ▓▓▓ knew that if a script was written it should only go to FALLSTON PHARMACY. The prescriptions were mostly sent to the pharmacy by facsimile and then the pharmacy would contact the patients for insurance information.

25. In November of 2013, ▓▓▓ MYERS, and BEATTY met at a restaurant located in Baltimore, MD. At this meeting, ▓▓▓ and MYERS expressed their frustration at BEATTY because ▓▓▓ and MYERS believed that more money should be being generated by the arrangement. ▓▓▓ AND MYERS also complained about various issues related to insurance companies not paying for the prescriptions. Specifically, ▓▓▓ was concerned that a large quantity of prescriptions he sent to the pharmacy were not ultimately being filled.

26. From December 2013 to February 2014, BEATTY sent at least the following payments to LABRX totaling an approximate amount of $7,370.64 pursuant to the above-discussed arrangement. MYERS monitored the payments closely and sent BEATTY an email on or around February 18, 2014 noting that MYERS was missing the payment for December of 2013.

7

| Date | From | To | Amount | Memo Note |
|---|---|---|---|---|
| 09/23/2013 | M&M Beatty LLC | LABRX | $5075.88 | Compound profit |
| 12/10/2013 | M&M Beatty LLC | LABRX | $555.33 | compound profit – Oct and Nov 2013 |
| 02/18/2014 | M&M Beatty LLC | LABRX | $1739.43 | compound profit – dec 2013 |

### Sale of FALLSTON PHARMACY to Company S.P.

27. In or around December 2013, BEATTY sold FALLSTON PHARMACY to company S.P., which was owned by S.G.[1] BEATTY, however, remained an employee of the pharmacy and the original agreement between BEATTY, ▇▇▇ and MYERS continued with S.G.

28. After the sale of the pharmacy to company S.P., MYERS continued to regularly communicate with BEATTY to obtain information about what compounded formulas "paid the best" and what ranges the prescriptions reimbursed at, so that MYERS could inform ▇▇▇ and the other doctors involved in the scheme of the most lucrative prescriptions to prescribe to patients. MYERS directly monitored the kickback payments being sent from the pharmacy and required monthly compound dispensing reports reflecting detailed information involving the prescriptions involved in the arrangement. These spreadsheets contained information such as the name of the prescribing doctor, the patient name, the insurance company, the compound type, the insurance payment, the patient co-pay, the total collected, and the net profit.

---

[1] Hereinafter, after the sale of the pharmacy to company S.P. and operated by S.G., the Statement of Facts continues to refer to the new pharmacy as FALLSTON PHARMACY.

29. MYERS continued to try to generate more revenue from the prescriptions, and, for example, on or around February 18, 2014, MYERS sent BEATTY an email noting that for some of ▆ older TRICARE prescriptions, reimbursements had averaged around $2,500 but that FALLSTON PHARMACY was only averaging approximately $1,300 for these prescriptions. BEATTY responded to this message by stating that they could "shoot for higher reimbursement."

30. In an email dated March 6, 2014, MYERS directed BEATTY to make sure the checks from FALLSTON PHARMACY were made out to LABRX, instead of MYERS, and that they were mailed to HANOVER MEDICAL, located in Bel Air, Maryland. HANOVER MEDICAL is solely owned by ▆

31. ▆ and MYERS sent a significant amount of prescriptions to the FALLSTON PHARMACY, and in April of 2014, MYERS sent BEATTY an email requesting that his commission be increased to 60% based on "our increase in scripts sent as well as revenue generated."

32. ▆ also remained heavily involved in making sure the business arrangement was as lucrative as possible for the parties involved. For instance, in an email sent on or around January 14, 2014 to MYERS and BEATTY, ▆ informed BEATTY that ▆ wanted to discuss various scar creams and "what they pay and what insurances are paying for it." ▆ was specifically interested in scar creams because at the time health insurance programs paid high reimbursements rates for these products. MYERS knew and understood that this was another mechanism by which ▆ could receive financial incentives from the kickback scheme through LABRX.

33. Indeed, in January of 2014, ▆ contacted BEATTY by email discussing a solution to the problem that FALLSTON PHARMACY, which was located in Maryland, could

9

not mail prescriptions to ▅▅▅ patients located in Virginia pursuant to Virginia law. Specifically, ▅▅▅ proposed: "Now that I have an office in MD can u fill VA scripts if they are mailed to my MD office and I hand deliver them to the [patients] in VA? Most would be TRICARE [patients]." FALLSTON PHARMACY ultimately delivered prescriptions to ▅▅▅ office so that ▅▅▅ could deliver the prescriptions to patients.

34. Furthermore, on or around March 26, 2014, ▅▅▅ sent BEATTY an email on which MYERS was included, in which ▅▅▅ complained that they needed the pharmacy to communicate better with the patients. ▅▅▅ stated: "Seth [MYERS] and I can get you busier but the [patients'] contact needs to get better."

35. In April 2014, BEATTY, MYERS, and ▅▅▅ met for dinner again in Baltimore, Maryland to discuss issues related to the kickback arrangement. Also present at the meeting were the FALLSTON PHARMACY Manager, N.K., and a technician that worked at the pharmacy, C.G. One purpose of the meeting was that MYERS indicated, pursuant to an email sent on March 28, 2014, that he had "several opportunities [he] was working on that would lead to a large increase [in] scripts and we need to discuss handling this." At one point during this meeting, ▅▅▅ expressed his frustration that FALLSTON PHARMACY was not billing as much as ▅▅▅ believed it should be. ▅▅▅ made clear that FALLSTON PHARMACY needed to find a way to bill the health insurance programs and get paid more for compounded prescriptions.

36. In addition to the concerns raised at this meeting, another source of frustration for ▅▅▅ and MYERS was that S.G. was not paying the amount agreed upon for each prescription. ▅▅▅ specifically raised this complaint to BEATTY.

37. During the time of the kickback arrangement, ▅▅▅ specifically asked BEATTY to waive certain patient co-payments at FALLSTON PHARMACY. MYERS understood that

10

▆▆▆▆ was directing that the co-payments be waived because since the compounded medications were so expensive, many of the patient co-payments were very high and patients either could not afford them or would not be willing to pay them. Because the insurance companies were paying such high reimbursements for the medications, it was still profitable for the co-conspirators to waive co-payments. MYERS knew at this time that waiving patient co-payments was inappropriate and violated the agreements physicians and pharmacies maintained with health insurance companies.

38. During the time after S.P. purchased FALLSTON PHARMACY, FALLSTON PHAMRACY sent the following payments to LABRX for a total approximate amount of $225,462.01. Approximately, $147,891.02 of this amount was for payments made by TRICARE.

| Check Date | From | To | Amount | Memo Note |
|---|---|---|---|---|
| 02/07/2014 | Fallston Pharmacy | Seth Myers | $11,153.64 | Jan-Total |
| 04/01/2014 | Fallston Pharmacy | LABRX | $5,000 | Feb-Comp |
| 04/15/2014 | Fallston Pharmacy | LABRX | $47,054.35 | March compounding commission |
| 05/19/2014 | Fallston Pharmacy | LABRX | $49,050.00 | |
| 05/20/2014 | Fallston Pharmacy | LABRX | $24,595.64 | |
| 05/23/2014 | Fallston Pharmacy | LABRX | $24,595.64 | April 2014 |
| 06/05/2014 | Fallston Pharmacy | LABRX | $21,337.58 | May account payments |
| 06/12/2014 | Fallston Pharmacy | LABRX | $21,337.58 | May account payments |
| 06/18/2014 | Fallston Pharmacy | LABRX | $21,337.58 | May account payments |

39. In total, TRICARE paid approximately $344,280.62 to FALLSTON PHARMACY for the prescriptions included in the kickback scheme. FALLSTON PHARAMCY made a net

11

profit of approximately $295,782.03 from payments made by TRICARE for compound prescriptions that were part of the kickback scheme, after estimated expenses are deducted. As such, LABRX received approximately $147,891.02 as a kickback from these payments made by TRICARE to FALLSTON PHARMACY for the compound prescriptions that were referred.

40. For the TRICARE prescriptions that FALLSTON PHARMACY received pursuant to the kickback scheme, the pharmacy would have collected a total of approximately $2,448.00 in co-payments from TRICARE patients. Pursuant to the arrangement with FALLSTON PHARMACY, LABRX would have been entitled to approximately 50% of those payments.

### *Laboratory Rx of Maryland*

41. Subsequent to the sale of FALLSTON PHARMACY, ▬▬▬ and MYERS were ultimately not happy with the business relationship with the pharmacy's new owner. ▬▬▬ and MYERS began discussing opening their own pharmacy, which would be called LABORATORY RX OF MARYLAND. ▬▬▬ and MYERS wanted BEATTY to work at this pharmacy as the Pharmacist-In-Charge. The plan was for ▬▬▬ the other doctors in ▬▬▬ primary medical practice, and the other doctors that MYERS and ▬▬▬ had recruited to send their prescriptions to LABORATORY RX OF MARYLAND. LABORATORY RX would receive 90% of the profits and BEATTY would receive 10% of the profits.

42. On or about May 19, 2014, BEATTY and MYERS, on behalf of LABORATORY RX, entered into an agreement regarding the operation of LABORATORY RX OF MARYLAND and the division of the profits. While MYERS (not ▬▬▬ signed the contract, MYERS understood that ▬▬▬ would control and direct the enterprise. MYERS also understood that ▬▬▬ could not be a party to the written contract because in Maryland it is impermissible for a physician to be an owner of a pharmacy. Despite the fact that ▬▬▬ did not sign the contract,

12

MYERS further understood that ▇▇▇ was involved in this venture because of ▇▇▇ significant participation in discussions about the project, the fact that ▇▇▇ directed BEATTY to meet with ▇▇▇ brother, who had access to a space where ▇▇▇ believed they could establish the pharmacy, and because ▇▇▇ and the other doctors at his practice planned to send a large number of prescriptions to the proposed pharmacy. In addition, MYERS knew that the majority of the proceeds from this venture would go to ▇▇▇

43. Ultimately, an alarm system was installed at the proposed pharmacy location, a contractor, who was a contact of ▇▇▇ modified the space to make it appropriate for a compounding pharmacy, equipment was purchased, and a bank account was set up. The space was inspected by the Maryland Board of Pharmacy and received the requisite approvals. Nevertheless, LABORATORY RX OF MARYLAND was never opened.

44. Due to ▇▇▇ frustrations with FALLSTON PHARMACY and BEATTY, ▇▇▇ informed MYERS that they needed to find another pharmacy to replace FALLSTON PHARMACY.

### Conspiracy with MEDEX HEALTH PHARMACY

45. In or around late 2013, ▇▇▇ directed MYERS to approach MOHAMED ABDALLA ("ABDALLA"), the owner of MEDEX HEALTH PHARMACY ("MEDEX"). In addition to MEDEX, ABDALLA operated or controlled other pharmacies including ROYAL CARE PHARMACY ("ROYAL CARE"), MILLENIUM PHARMACY ("MILLENIUM"), PHARMACY at GREAT FALLS ("GREAT FALLS"), all located within the Eastern District of Virginia. ▇▇▇ told MYERS to determine if ABDALLA would be interested in a similar kickback arrangement to the one that ▇▇▇ had with FALLSTON PHARMACY. ▇▇▇ instructed MYERS to show ABDALLA information about the profits made at FALLSTON

13

PHARMACY to convince ABDALLA to do business with them. Initially, ABDALLA lacked interest in the deal, but once he saw the profits, he changed his mind. ▮▮▮ instructed MYERS to negotiate a profit split of 80% for ▮▮▮ through LABRX and 20% for ADBALLA and to tell ABDALLA he was lucky to receive 20%. MYERS was shocked that ABDALLA accepted the offer because the percentage LABRX was receiving was so high.

46. On or around May 20, 2014, ABDALLA and MYERS, on behalf of LABRX, entered into a Marketing Agreement that documented the relationship and the negotiated profit split. Specifically, MYERS agreed to provide "marketing" services for MEDEX in exchange for fees. MYERS agreed to "devote such time, energy and skill on a regular and consistent basis as is necessary to solicit orders and promote the sale of MEDEX's products." In exchange, MEDEX agreed to provide LABRX, "80% of the sales on all products sold to customers by the Area Manager . . . and 80% on all products sold by his/her subordinate marketing representatives." There were never any discussions about actual marketing, and instead the parties understood that the agreement was solely for prescription referrals. Based on his conversations with ABDALLA, MYERS believed that ABDALLA knew that the prescriptions would come from ▮▮▮ and other doctors they would recruit and that proceeds were going to ▮▮▮

47. Once the arrangement was finalized, MYERS provided ABDALLA with the pre-printed prescription pad from FALLSTON PHARMACY. ABDALLA began running prescriptions through insurance programs and adjusting them to reflect the formulas that paid the most money. ▮▮▮ also instructed ABDALLA to waive patient co-payments in certain instances. ▮▮▮ and MYERS further instructed ABDALLA to provide compound dispensing reports to track the number of prescriptions sent to MEDEX pursuant to the conspiracy. ▮▮▮

14

did not trust ABDALLA to fully adhere to the terms of the agreement so ▓ asked MYERS to try to obtain access to MEDEX's software systems to track the prescriptions.

48. During the kickback arrangement with ABDALLA, ▓ wrote increasingly more compound prescriptions. MYERS was aware of this because of the increased volume reflected on the compound dispensing reports and the increase in money being sent to LABRX. Prescriptions from other individuals at ▓ including, Dr. V.M., Dr. G.P., and PA R.O. were being sent to MEDEX as part of the agreement, along with prescriptions from other doctors that ▓ and MYERS recruited such as Dr. A. D. and Dr. A.C. in Georgia. According to MYERS, ▓ was aware of the amount of money being generated and ▓ "tracked every penny." Every month, ▓ would review the books in detail.

49. When LABRX generated significant money from the compounding, ▓ instructed MYERS to make ▓ wife, K.R., a salaried employee of the company. ▓ told MYERS that this was a way for ▓ to get money out of LABRX and he instructed MYERS to give K.R. a salary of $200,000. Since MYERS' salary at this time was $200,000, ▓ increased MYERS' salary to $250,000 when K.R. began taking a salary from LABRX. In late 2014-early 2015, ▓ also instructed MYERS to use LABRX to pay for K.R.'s lease of a Mercedes SUV. In September 2015, LABRX wrote a check to ▓ in the amount of $280,000, which purported to be a loan (but was never repaid) so that ▓ could purchase a building in Baltimore, Maryland.

50. At some point in the conspiracy, ABDALLA informed ▓ and MYERS that the health insurance programs were no longer paying as much money for compound medications but the co-conspirators continued the arrangement, profiting on the amounts the insurance programs did pay. Eventually, ABDALLA attempted to renegotiate the arrangement so that he

would receive 40% percent of the profits instead of 20%. ▇ rejected the proposal and the relationship between ABDALLA and ▇ started to deteriorate.

51. Around the same time, ▇ learned from several patients that the patients' prescriptions, which had originally been sent to MEDEX, were filled at other pharmacies. In February of 2016, ▇ sent MYERS an email noting that ABDALLA was sending patients to MILLENIUM and directed MYERS to find out who owned the pharmacy. ▇ and MYERS learned that ABDALLA sent the prescriptions to other entities owned by ABDALLA to avoid paying LABRX pursuant to the co-conspirators' agreement. Eventually, at ▇ request, MYERS filed a lawsuit for money ▇ believed that ABDALLA owed under the Marketing Agreement. ▇ and MYERS ultimately stopped referring prescriptions to ABDALLA.

52. During the time of the conspiracy with ABDALLA, MEDEX sent at least the following payments to LABRX for a total of approximately $2,573,323.45.

| Check Number/Wire Ref# | Check Date | From | To | Amount |
| --- | --- | --- | --- | --- |
| 1053 | 07/18/2014 | Medex Health LCC | Laboratory RX | $135,200.00 |
| 1055 | 07/23/2014 | Medex Health LCC | Laboratory RX | $55,315.30 |
| 1076 | 08/22/2014 | Medex Health LCC | Laboratory RX | $288,720.00 |
| 1112 | 09/25/2014 | Medex Health LCC | Laboratory RX | $213,375.90 |
| 1145 | 10/24/2014 | Medex Health LCC | Laboratory RX | $259,894.82 |
| 1192 | 11/28/2014 | Medex Health LCC | Laboratory RX | $157,863.23 |
| 1244 | 01/05/2015 | Medex Health LCC | Laboratory RX | $127,634.71 |
| 1266 | 01/26/2015 | Medex Health LCC | Laboratory RX | $205,343.92 |
| 1301 | 02/25/2015 | Medex Health LCC | Laboratory RX | $165,980.82 |

| 1318 | 03/25/2015 | Medex Health LCC | Laboratory RX | $194,900.00 |
| 1320 | 03/25/2015 | Medex Health LCC | Laboratory RX | $2,039.85 |
| 1359 | 04/26/2015 | Medex Health LCC | Laboratory RX | $191,274.84 |
| 1392 | 05/26/2015 | Medex Health LCC | Laboratory RX | $206,380.77 |
| 1400 | 06/03/2015 | Medex Health LCC | Laboratory RX | $3,997.80 |
| 1424 | 07/08/2015 | Medex Health LCC | Laboratory RX | $71,069.76 |
| 1442 | 07/08/2015 | Medex Health LCC | Laboratory RX | $18,424.60 |
| 1490 | 08/17/2015 | Medex Health LCC | Laboratory RX | $22,147.73 |
| 1546 | 09/22/2015 | Medex Health LCC | Laboratory RX | $35,251.21 |
| 1577 | 10/21/2015 | Medex Health LCC | Laboratory RX | $23,153.75 |
| 1032 | 11/17/2015 | Medex Health LCC | Laboratory RX | $70,337.42 |
| 1049 | 12/22/2015 | Medex Health LCC | Laboratory RX | $14,890.84 |
| 1050 | 12/22/2015 | Medex Health LCC | Laboratory RX | $110,126.18 |

53. In total, TRICARE paid approximately $2,335,332.62 to MEDEX for the prescriptions included in the kickback scheme and paid ROYAL CARE, another pharmacy owned by ABDALLA to which ABDALLA sent prescriptions he received pursuant to the kickback scheme, approximately $2,152,978.12. MEDEX made a net profit of approximately $2,208,602.12 and ROYAL CARE made a net profit of approximately $953,054.92 from payments made by TRICARE for compound prescriptions that were part of the kickback scheme, after estimated expenses are deducted. As such, LABRX received approximately $2,529,325.63 as a kickback from these payments made by TRICARE to the pharmacy for the compound prescriptions that were referred.

54. For the TRICARE prescriptions that MEDEX received pursuant to the kickback scheme, the pharmacy received a total of approximately $11,725.91 in co-payments from TRICARE patients and ROYAL CARE received approximately $10,928.00 in co-payments from TRICARE patients. Pursuant to the arrangement with MEDEX, LABRX received approximately $18,123.13 of these co-payments that TRICARE patients paid.

55. During the period of the conspiracy, FALLSTON PHARMACY made a net profit of approximately $295,782.03, MEDEX made a net profit of approximately $2,208,602.12, and ROYAL CARE made a net profit of approximately $953,054.92 from payments made by TRICARE for compound prescriptions that were part of the kickback scheme. As such, the co-conspirators received a total net profit of approximately $3,457,439.07 pursuant to the scheme.

56. During the period of the conspiracy, TRICARE paid a total of approximately $344,280.62 to FALLSTON PHARMACY, TRICARE paid a total of approximately $2,335,332.62 to MEDEX, and TRICARE paid a total of approximately $2,152,978.12 to ROYAL CARE for the prescriptions included in the kickback scheme. As such, TRICARE paid the co-conspirators a total of approximately $4,832,591.36 pursuant to the scheme.

### End of MYERS' Work With ▮▮▮

57. Ultimately, the health insurance programs stopped reimbursing for compound medications and ▮▮▮ stopped writing a significant number of compound prescriptions. ▮▮▮ informed MYERS that he would no longer write the compound prescriptions if he was not paid enough.

58. In or around the summer of 2016, ▮▮▮ contacted MYERS and informed MYERS that their business arrangement was no longer working. At about this time, MYERS stopped working with ▮▮▮

18

## Conclusion

59. The acts described above were done willfully and knowingly and with specific intent to violate the law, and not by accident, mistake, inadvertence, or other reason.

60. This Statement of Facts does not contain each and every fact known to MYERS and to the United States concerning MYERS's and his co-conspirators', including and RALEY's, BEATTY's, and ABDALLA's, involvement in the charges set forth in the plea agreement.

61. This Statement of Facts shall be admissible as a knowing and voluntary confession in any proceeding against MYERS regardless of whether the plea agreement is present to or accepted by the Court. Moreover, MYERS waives any rights that he may have under Fed. R. Crim. P. 11(f), Fed. R. Evid. 401, the United States Constitution, and any federal statute or rule in objecting to the admissibility of the Statement of Facts in any such proceeding.

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney

_____
Uzo Asonye
Monika Moore
Assistant United States Attorneys
U.S. Attorney's Office for the Eastern District of Virginia

Date: June 22, 2020

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, SETH MICHAEL MYERS, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____
SETH MICHAEL MYERS

I am Robert M. Radick, the defendant's attorney. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

_____
Robert M. Radick, Esq.
Attorney for SETH MICHAEL MYERS

20