**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:20 CR 235** |
| | ) | |
| **SETH MICHAEL MYERS,** | ) | **The Hon. Claude M. Hilton** |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## DEFENDANT'S POSITION ON SENTENCING

This sentencing memorandum is respectfully submitted on behalf of Seth Myers, who is scheduled to be sentenced by your Honor at 9:00 a.m. on March 19, 2021.[1]

## PRELIMINARY STATEMENT

On September 30, 2020, Seth Myers pleaded guilty to a one-count Criminal Information arising from his participation in conduct by which he and his physician-employer ("Physician-1") conspired to solicit and receive kickbacks for referring prescriptions the physician referred to specific pharmacies. Seth fully acknowledges the illegal nature of his conduct and accepts absolute responsibility for the terrible decisions that have brought him before the Court. Without in any way minimizing the seriousness of Seth's criminal actions or the harm those actions have caused, this memorandum sets out the many mitigating factors that we believe are relevant to a just and appropriate sentence.

---

[1] Seth's letter to the Court is attached as Exhibit A to this submission, and letters written by Seth's family and friends are attached as Exhibits B through F. The versions of the sentencing submission and accompanying letters that are publicly filed have been redacted to remove personal health information and other sensitive personal information. A motion for leave to file under seal was filed on March 12, 2021. Unless the Court directs otherwise, we will provide unredacted versions of this submission and the accompanying letters directly to the Court and the Government, and will also file an unredacted set of those materials under seal with the Clerk of Court.

Seth is the first to admit that he is here because of his own poor choices, and he knows that he must bear the consequences of his actions.  Indeed, rather than making excuses or attempting to minimize his conduct, he accepted responsibility by pleading guilty at the earliest possible opportunity.  Seth also cooperated fully with the Government's investigation, agreed to pay forfeiture and restitution, and has long stood ready – and continues to stand ready – to testify at any time and in any place about all criminal conduct of which he is aware.[2]

Despite his substantial efforts to mitigate the impact of his conduct, Seth and his family have suffered enormously as a result of his illegal actions.  Seth is the family's sole breadwinner, with two nineteen-year-old twin sons living at home, ███████████████████████ ████████████████████████████████████████████████████████ Seth is acutely aware of the significant pain that his actions will cause ████████████████, and he also knows that his transgressions have deeply damaged his marriage of 24 years, perhaps beyond repair.  The degree of suffering and harm that he has caused to innocent family members is a source of constant anguish for Seth, and is something that he will forever carry with him.

Fully aware of the devastating impact of his illegal actions, Seth has taken meaningful and determined steps to reshape his life, provide for his family, and atone for his wrongdoing.  He is shuffling multiple jobs to shore up his family's finances to the extent possible prior to any period of incarceration, including by working evenings and weekends in the cheese department at a local grocery store.  He has grown as a person, pursued positive change, and left behind the mindset that contributed to the criminal conduct in which he engaged.  In fact, as someone who

---

[2] We emphasize at the outset that any reference to Seth's cooperation is offered solely as evidence of his acceptance of responsibility and the deep remorse he feels for his actions.  Due to the present circumstances, in which there is not currently a § 5K1.1 letter on Seth's behalf, we do not offer Seth's efforts at cooperation as an independent mitigating factor relevant to his sentencing, nor have we included it in our discussion of the relevant sentencing factors under 18 U.S.C. § 3553(a).

otherwise lived a law-abiding existence, Seth is wholly committed to personal growth, rebuilding his life, being there for his family, and putting himself back onto a productive path.  He has worked on himself introspectively, through therapy and by finding a renewed sense of purpose and outlook.  And he has transformed the way he lives outwardly, not only by strengthening the bonds he has with his family, but also by deepening his connections with and service to his community.

We respectfully submit that these and the many other relevant factors set forth herein warrant a sentence substantially below the applicable Guidelines range.[3]  On Seth's behalf, and without minimizing the seriousness of his crime, we therefore request that the Court be as lenient as possible in crafting a sentence that is sufficient, but not greater than necessary, to achieve the aims of the sentencing regime.

## BACKGROUND FACTS

### I.      Seth's Personal and Family History

Seth Michael Myers was born in Greenwich, Connecticut in 1967, the youngest of three children born to Robert Myers and the late Bernice (Friedman) Myers.  Seth and his two sisters – Robin and Jane – grew up in Stamford, Connecticut.  Seth's mother Bernice, a daughter of Russian immigrants, had finished high school despite enduring a hard-scrabble childhood in tenements on the Lower East Side, where her father's gambling habits strained the family's finances.  After Seth's oldest sister was born, Bernice stayed at home to look after the children.  Seth's father Robert, for his part, owned and operated a woman's apparel manufacturing

---

[3] For the reasons set forth in detail below, we also submit that the applicable Guidelines range in this case is 37 to 46 months, notwithstanding the higher calculation that the Probation Department advances and as to which the Government takes no position.

company called "Point of View" for over 30 years, thereby providing a degree of financial stability and security for his wife and three children.

Seth understood the value of hard work from a young age.  At 12, he was already earning tips working as a caddy at the local golf course.  When Seth turned 13, he started spending his summers in the shipping department at his father's company.  He continued to work for his father through high school, learning important lessons about business.

Seth's grandfather and father had both graduated from Johns Hopkins University, and it was expected that Seth would follow in their footsteps.  At the St. Luke's School, where Seth attended high school, he studied hard and excelled academically, graduating as the class salutatorian.  He ultimately gained acceptance to Johns Hopkins through its early admissions program.  During these years, Seth played football and lacrosse and appeared to maintain the ordinary life of a teenager and young adult.

But, beneath the surface, Seth was hurting.  He was struggling emotionally to cope with the abusive relationship he had with his father.  Although Robert had ensured that Seth and his mother were taken care of financially, he did not perform that role without exacting an emotional price for it.  Robert had an explosive temper.  He was seemingly never satisfied at anything Seth accomplished.  He was the type of person who would wave his finger in Seth's face and scream at him to express his disappointment.  Seth remembers hiding in his bedroom whenever he sensed his father was inclined to erupt.

 Despite the trauma he suffered, Seth graduated from Johns Hopkins with a degree in political science.  During college, however, Seth's troubled relationship with his father reared its ugly head.  Once Seth was out of his childhood home, it was difficult for him to adjust to a life without his father's oppressive expectations and demands.  As such, Seth turned away from his

usual focus on academic achievement.  Seth's grades slipped at Johns Hopkins, and he was placed on academic probation after his first semester.  Yet, in the end, Seth overcame the difficult transition he endured, and he managed to right the ship and graduate in four years. Although his grades were less than stellar, Seth was able to forge lasting friendships at Johns Hopkins.  Robin, Seth's sister, notes in her letter to the Court that Seth has always maintained close friendships throughout his life, even with those he met in high school and college, and that he was incredibly loyal to his friends.  For example, Robin writes that when Seth was a college student, "one of his roommates had a young child, so it was a lot to juggle, and Seth was always there to help him out and be supportive of his friend's struggles."  Ex. B.

After graduating from college, Seth relocated to New Jersey to work for a chemical waste company for a couple of years, before entering Hofstra Law School in 1991.  Seth was an unremarkable student during law school, and in 1994, after graduating, he moved near his sister Robin in Florida with the hopes of passing the Florida Bar Exam and securing a position as an attorney in that state.  As she recounts in her sentencing letter, Robin fondly remembers her brother's time living nearby, noting that she "had two young children at the time and Seth would come over to the house and help me out."  Ex. B.

Seth quickly forged new friendships in Florida, a recurring theme in his life.  Joan Dwoskin, a fellow bar examinee, notes in her letter to the Court that she and Seth would "spend countless hours" studying together and became "fast friends."  Ex. C.  Joan even credits Seth for her passing the bar exam on the first attempt, stating that Seth "cheered for me when I did not feel confident that I would pass; he was patient and generous with his time, working through practice exams over and over." Joan writes that Seth is a "reliable, honest, and funny friend."

Seth's plans to work as a lawyer in Florida never came to fruition.  Instead, Seth's father, who at this point had closed his clothing apparel manufacturing company and started a commercial lending business, asked Seth to come work for him.  Despite the toxic history Seth had with his father, he decided to take the job offer, returning to his family home in Stamford in 1995.  It was at this point that Seth was introduced to factoring, a type of debtor finance in which a business sells its accounts receivable to a third party at a discount.

In Connecticut, there was not just a job waiting for Seth.  Seth also met Marley DePalma there, who was working at the time with Seth's mother at a psychiatrist's office in town.  Marley describes the start of their relationship in her letter to the Court: "Seth and I began a sweet, sincere friendship, and then began dating."  Ex. D.  Marley also explains in her letter that she was attracted to Seth's "kindness, ability to listen and dedication to family values," and writes that she "immediately knew he was a special individual that I would in turn marry and one day be the father of our children."

In 1996, Seth and Marley purchased a home in Ivoryton, Connecticut and married shortly afterward.  As it happens, Physician-1, who had gone to college with Seth at Johns Hopkins and remained close friends with him, was Seth's best man. Seth and Marley spent the early years of their marriage together in Ivoryton, where Seth continued to work for his father and Marley worked as an elementary school teacher and then began graduate school.  Marley notes in her letter that Seth "unselfishly supported" her dream to continue her education when, as a newly married couple, they "could have benefitted from another income."  Ex. D.  Marley also writes that Seth put Marley's "dream of educating children in front of his own and worked extra hours to support me," and that is "the type of individual he is."

Seth and Marley next moved to Severna, Maryland, where, in 2001, they became the proud parents of twin boys, Cole and Connor.  From the day his twin sons were born, Seth has been immensely proud to be their father, and utterly devoted to his role in helping to raise them. ██████████████████████████████████████ Seth has been particularly attentive to their education, and he has worked hard over the years to ensure their stability and security, along with that of his wife.  In fact, soon after the twins were born, Marley left her job because, as she writes in her letter, ██████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████ And Marley notes that Seth not only "would work a full day, commute over an hour and a half and then ████████████████████████████████ ███████████████████████████ but also that Seth "never complained and did it out of love and care for his family."

Although Seth is painfully aware of and haunted by the suffering that his criminal conduct will have upon his sons, part of what otherwise made Seth a successful father was his willingness to support his sons' passions.  Especially important to Seth was helping Connor achieve his goal of attending art school.  Although last fall Connor had to put off his attendance at Minneapolis College of Art and Design because of COVID-related restrictions, Seth and Marley hope that Connor will be able to start there this upcoming September.  Marley recounts that Seth "did hours of preparation" with Connor as he applied to art schools, and that Seth has

███████████████████████████████████████████████

███████████████████████████████ Ex. D.  Seth likewise cherishes the time he spends

with Cole, including their shared love of professional wrestling, which Seth and Cole spend many nights together watching on television.

## II.    Seth's Employment with Physician-1 and the Offense Conduct

Of course, Seth recognizes that his own conduct has now jeopardized the security he long provided for his family.   In fact, Seth knows that he is at great risk of being separated from the children he loves, and of being absent from them and his wife during a period in which his family depends upon him greatly.  This has been a constant source of pain and fear that has consumed Seth since the Government first approached him in May 2019 regarding this matter, and it has taken an enormous toll on Seth and his wife.

The backdrop to Seth's actions in this case begins in 2008, approximately seven years after the twins were born.  Seth and Marley had moved to Illinois by that time, and Seth was working for Bayview Funding, a factoring company, when the financial crisis hit.  Given the dire economic circumstances in the country at the time, the prospects for advancement and even continued employment at Bayview Funding did not appear promising, and it was around this time that Physician-1, who had been Seth's college friend and the best man from his wedding, approached Seth with the opportunity of coming to work for him.  In order to ensure a stable source of income during the financial crisis, Seth accepted Physician-1's offer – a choice that Seth now considers the worst decision of his life.

As the stipulated Statement of Facts in the Presentence Investigative Report ("PSR") makes clear, Physician-1 initially approached Seth to "work for him and another physician who wanted to become involved in the factoring industry," PSR ¶ 16, an industry Seth knew well. From 2008 to 2013, as an employee of Physician-1, Seth performed various jobs for several of Physician-1's companies.  PSR ¶ 23.  For example, Seth helped Physician-1 and his partner set

up two companies, "one which was a factoring business and another … that bought medical devices and sold them to hospitals as a third-party billing party."  PSR ¶ 17.  Physician-1 also approached Seth about a Physician Owned Distributorship ("POD") of which Physician-1 was already a member.  PSR ¶ 20.  The POD in which Physician-1 participated derived its revenue by selling implantable medical devices for use in surgical procedures, and Physician-1 structured the transactions in such a way that his POD purchased implants from another company that Physician-1 owned, thereby permitting Physician-1 to profit off the transactions twice.  PSR ¶ 21.  Notably, during the entirety of his work with Physician-1, Seth never received a share of the profits from these businesses, nor did he have a genuine ownership interest in any of Physician-1's various financial enterprises; instead, Seth was compensated only through a fixed salary that Physician-1 determined.  PSR ¶ 63.

In approximately the late spring or early summer of 2013, while still working for Physician-1, Seth entered into the conspiracy that is the subject of Seth's guilty plea in this matter, and which Seth so deeply regrets.  As part of Physician 1's efforts to generate substantial income beyond that which he was already receiving, Physician-1 had decided to solicit and receive kickbacks from pharmacists in return for sending those pharmacists prescriptions for highly remunerative compounded drugs.  In connection with this scheme, pharmacists who had been recruited by Physician-1 would identify the compounded drug formulations that were most likely to obtain substantial reimbursement from government programs, and Physician-1 would write prescriptions for those medications.  Physician-1 would then arrange for those prescriptions to be filled by the specific pharmacists and pharmacies that were part of the scheme, and the pharmacists would in turn be required to pay a percentage of the reimbursements they received

to still another company that, while nominally owned and controlled by Seth, in fact was entirely controlled by Physician-1.

Throughout the time in which Physician-1 recruited pharmacists and demanded kickbacks from them in exchange for referring compounded prescriptions to their pharmacies, Seth facilitated the scheme by performing various tasks for Physician-1.  In particular, Seth documented the paperwork for the "marketing" agreements, PSR ¶¶ 33, 60; ordered pre-printed prescription pads, PSR ¶ 37; monitored monthly prescription reports, PSR ¶¶ 42, 62; looked up the latest TRICARE reimbursement rates for compounded formulas, PSR ¶ 43; processed payments made to Physician-1's companies, PSR ¶ 44; and attended meetings, PSR ¶¶ 32, 49.

As his guilty plea and his acceptance of the stipulated facts in this matter make clear, Seth fully recognizes that what he did on behalf of Physician-1 was illegal, unethical, and wrong. In fact, Seth has acknowledged his participation in a criminal conspiracy, and has never made any excuses for his conduct.  It is nonetheless the case, however, that, as the PSR indicates, Seth's role in the conspiracy largely involved serving as an intermediary between Physician-1 and the pharmacists who paid kickbacks to Physician-1 in exchange for the prescriptions that he was writing.  For example, upon being directed to do so by Physician-1, Seth would convey to the pharmacists the reimbursement split that Physician-1 required.  PSR ¶ 59.  At Physician-1's behest, Seth also entered into written "marketing" agreements in which he was a party in name only, primarily because Physician-1 believed that placing Seth as the intermediary would help insulate Physician-1 from the illegal conduct in which he was engaged.  PSR ¶ 56.  After the agreements had been executed, Seth would serve as the point-of-contact for the pharmacists who would email Seth their reports and furnish information about which compounded formulas reimbursed at the highest amounts, which Seth would then forward to Physician-1.  PSR ¶ 42.

10

And, as the conspiracy unfolded and the pharmacists began sending their kickback payments to Physician-1, and until such time as Physician-1 terminated Seth's employment, Seth verified that the pharmacists made the checks payable to the correct Physician-1-owned entity, and that they were sent to the correct address.  PSR ¶ 44.

### III.     Procedural History

In May 2019, approximately three years after his conduct with Physician-1 had ended, the Government approached Seth with a Target Letter, and he decided almost immediately that he would accept responsibility for his actions and endeavor to assist the investigation in any way possible.  Seth retained counsel on June 1, 2019, and promptly began cooperating with the Government's investigation, meeting with prosecutors from the U.S. Attorney's Office for the Eastern District of Virginia, shortly thereafter and several times thereafter.  On September 30, 2020, Seth waived indictment and pleaded guilty to an information charging one count of conspiracy to receive health care kickbacks, in violation of 18 U.S.C. § 371.

### GUIDELINES CALCULATION

Seth's plea agreement with the Government did not include a role enhancement under § 3B1.1 of the U.S. Sentencing Guidelines.  Similarly, in its recently filed sentencing memorandum, the Government does not argue for or take a position on the applicability of a role enhancement in Seth's case.  Nonetheless, the PSR applies a three-level enhancement to Seth over our objection, on the theory that Seth was a manager or supervisor of an offense that involved five or more participants.

We disagree with this aspect of the PSR, and for the reasons set forth below, we respectfully submit that Seth was not a "manager or supervisor" under § 3B1.1.  We further submit that the showing necessary to support such an enhancement has not been made, and that

11

the correct Guidelines calculation is that which was captured by the stipulations in the parties' plea agreement, which is as follows:

| | |
|---|---|
| Base Level (§2X1.1): | 8 |
| Specific Offense Characteristics (§§2B4.1, 2B1.1): | +16 |
| Adjustment for Role in the Offense: | 0 |
| Criminal History Category: | I (0) |
| Acceptance (Chapter 3, Part E): | -3 |
| Offense Level: | 21 (37 to 46 months) |
| Fine: | $15,000 to $150,000 |

Pursuant to Guidelines § 3B1.1, the imposition of a three-level aggravating role enhancement requires that a defendant was the "manager or supervisor" of one or more other participants in the offense and that the criminal activity involved five or more participants, or was otherwise extensive.  In deciding whether such a role enhancement is applicable, the sentencing court "must consider" the seven factors provided in Application Note 4 to Guidelines § 3B1.1.  *See United States v. Cameron*, 573 F.3d 179, 184 (4th Cir. 2009); *see also United States v. Sayles*, 296 F.3d 219, 224 (4th Cir. 2002).  Moreover, an aggravating role enhancement may not be properly applied unless the record contains a sufficient evidentiary basis to do so, and the Fourth Circuit has held that it is error to apply an aggravating role enhancement without specific facts that support it.  *Sayles*, 296, F.3d at 225-27.  The factors provided in Application Note 4 that must be considered are the following:

> [1] the exercise of decision making authority, [2] the nature of participation in the commission of the offense, [3] the recruitment of accomplices, [4] the claimed right to a larger share of the fruits of the crime, [5] the degree of participation in planning or organizing the offense, [6] the nature and scope of the illegal activity, and [7] the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1, cmt. 4.

The "Background" section to the commentary to § 3B1.1 provides still further context, noting that those who exercise a "supervisory or managerial role in the commission of an offense

12

tend to profit more from it."  And, importantly, the Application Notes to U.S.S.G. § 3B1.2, while relating to adjustments for a *mitigating* role rather than an aggravating one, are also relevant here, as they explicitly provide that "a defendant who does not have a proprietary interest in the criminal activity and who is simply being paid to perform certain tasks should be considered for a[] [downward] adjustment."  Application Note 3(C).

As we advised the Probation Department in our objections to the PSR, each of the above-cited factors relating to aggravating role enhancements weigh against the application of such a role enhancement here.  Moreover, while the PSR notes in response to our objections that "just because [Seth] was acting at someone else's direction does not absolve him of his responsibility for the role he took on," PSR at p. 31, the issue remains whether Seth independently exercised supervisory or managerial authority over other participants in the scheme.  It is clear from the stipulated Statement of Facts that Seth did not, and we address in turn each of the relevant factors that must be considered under Application Note 4.

- <u>Decision Making Authority</u>:

  - Based on the stipulated Statement of Facts, it was Physician-1 who had full decision-making authority as to the scheme.  In particular, and by way of example, the Statement of Facts contains the following details, all of which confirm that (a) it was Physician-1 who had the decision-making authority in this matter and who directed the actions of Seth, and (b) Seth possessed no decision making authority of his own:

    - Physician-1 approached and recruited Seth to work for him, and was Seth's employer at all times relevant to the offense.  PSR ¶¶ 16-18.

    - Physician-1 "had the idea" to form the company that became central to the offense conduct in this case; controlled that company; and "made clear to Myers that Myers was not allowed to use any of the money associated with the company."  PSR ¶ 22.

    - Physician-1 "initially brokered the kickback deal" with Michael Beatty of Fallston Pharmacy, and "sent Myers to meet with Beatty" so as to document the arrangement into which Physician-1 had already entered.  PSR ¶ 32.

- o  Physician-1 decided to which pharmacies he would send prescriptions for lucrative compounded drugs, relied on pharmacists such as Michael Beatty to identify the compound formulas that would receive the largest amounts in reimbursements, wrote the prescriptions for those drugs, and sent those prescriptions to the pharmacies that paid him kickbacks for his referrals.  PSR ¶ 35.

- o  Just as he had directed Seth to approach Michael Beatty of Fallston Pharmacy, Physician-1 "directed Myers to approach Mohamed Abdalla" of MedEx Health Pharmacy, as Physician-1 had chosen MedEx as the entity that would take over the kickback arrangement that Physician-1 previously had with Fallston.  PSR ¶ 59.

- o  Physician-1 "instructed Myers to negotiate a profit split" of 80%/20% between Physician-1 and Mohamed Abdalla of MedEx, with the 80% portion of the profits of that arrangement going to Physician-1, while Seth was paid only a fixed salary.  PSR ¶¶ 59, 63.

- o  Physician-1 rejected a later proposal by which Mohamed Abdalla sought to "renegotiate the arrangement" that Physician-1 had originally put in place, thereby causing the relationship between Abdalla and Physician-1 "to deteriorate."  PSR ¶ 64.

- o  Physician-1 unilaterally determined, when health insurance programs stopped reimbursing for compound medications, that the "business arrangement was no longer working," and effectively terminated Seth's employment.  PSR ¶ 72.

- • Nature of the Participation in the Commission of the Offense:

  - • In addition to the foregoing facts that show Seth's lack of discretion and authority, the stipulated Statement of Facts indicates that Seth's role was frequently that of a go-between between Physician-1 and pharmacists such as Michael Beatty and Mohamed Abdalla, rather than that of an individual who managed or supervised others.

  - • Indeed, the Statement of Facts makes clear that Seth's role primarily involved (i) documenting the "marketing" arrangements that Physician-1 had negotiated for his own benefit, PSR ¶¶ 34-35, 59-60; (ii) providing prescription pads to Physician-1 based on the compounded formulations that Beatty and Abdalla indicated would be the most profitable for Physician-1, PSR ¶¶ 37, 61; (iii) conveying information between Physician-1 and the pharmacy owners, including information relating to the payments Physician-1 received as kickbacks for the prescriptions Physician-1 wrote, PSR ¶ 40, 42-44; and (iv) nominally owning corporate entities that generated income for Physician-1 and were under Physician-1's absolute control, PSR ¶¶ 22-23.

  - • Thus, while Seth interacted with the pharmacists who were paying kickbacks to Physician-1, and sometimes conveyed Physician-1's directions to those pharmacists,

Seth's role was not that of a manager or supervisor, but rather that of an individual who followed the directions of Physician-1 and did not himself have authority over the other participants in the scheme.

- <u>The Recruitment of Accomplices</u>:

  - Although Seth does not dispute that he was present at meetings in which specific arrangements with pharmacists like Mr. Beatty and Mr. Abdalla were discussed and agreed upon, and helped document "marketing" arrangements for those pharmacists, the PSR's finding that Seth personally recruited pharmacists or anyone else in the scheme represents an oversimplification of the facts.

  - As the PSR notes, it was Physician-1 who in fact had already recruited Michael Beatty and had "initially brokered" the kickback deal with Mr. Beatty before Seth ever met or even spoke with him.  PSR ¶ 32. The "recruitment" of Mr. Beatty was thus largely already accomplished before Seth even became involved.

  - Similarly, as the PSR notes, it was Physician-1 who "directed Myers to approach Mohamed Abdalla," and Physician-1 who determined the terms of the kickback arrangement that brought Mr. Abdalla into the conspiracy.  PSR ¶ 59.

  - In this regard, Seth's role was not consistent with that of a typical "recruiter," and this factor in U.S.S.G. § 3B1.1 does not support an aggravating role enhancement.

- <u>The Claimed Right to a Larger Share of the Fruits of the Crime</u>:

  - Based on the stipulated facts, there can also be little doubt that, among the primary participants in the offense conduct at issue, Seth did not have a right to "a larger share of the fruits of the crime." To the contrary, Physician-1 solely controlled the corporate entities that were crucial to the scheme, and Physician-1 alone received the kickbacks that the scheme generated.  Similarly, the pharmacy owners were the individuals in the scheme who obtained the reimbursements from federal health care programs that were at the core of the scheme, who kept a significant portion of those reimbursements, and who in turn made the kickback payments to Physician-1 that permitted the scheme to continue.

  - Seth, by contrast, received not a profit share or a percentage of the crime's proceeds, but instead a fixed salary that was determined entirely at the discretion of Physician-1.  Seth also had no genuine ownership interest in the enterprise or the corporations that were part of it, received substantially smaller amounts in salary than the amounts that at least Physician-1 and Mr. Abdalla obtained from the scheme; and was effectively terminated by Physician-1 as soon as the scheme no longer profited Physician-1 in the manner that suited him.  PSR ¶ 63.  In this regard, given Seth's lack of a right to any share of the

15

fruits of the crime (other than the salary Physician-1 set for him), this factor, like the other factors addressed thus far, weighs against an aggravating role enhancement.

- Degree of Participation in Planning or Organizing the Offense; Nature and Scope of the Illegal Activity; and Degree of Control and Authority Exercised Over Others

  - The remaining factors set forth in Application Note 4 to Guidelines Section 3B1.1 – namely, Seth's degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and Seth's degree of control and authority exercised over others – are largely encompassed within the discussion already set forth above, and thus warrant only brief additional discussion.

  - As indicated above, Seth does not in any way seek to dispute his knowing participation in the illegal actions in this case, nor does he deny or minimize the seriousness of the offense conduct of which he was a part. Seth also recognizes that, as an employee of Physician-1, he was working directly for the individual who was at the center of the offense conduct throughout the time the conspiracy was in place.

  - However, as the stipulated facts demonstrate, it was Physician-1 who was the primary planner and organizer of the offense. Physician-1 determined which prescriptions he would write; how much he would demand in payment for those prescriptions; which pharmacists he would work with; and which pharmacists (or, in Seth's situation, which employees) he would sever ties with because the arrangement was no longer lucrative enough to suit Physician-1's goals.

  - Physician-1 also determined the nature and scope of the illegal activity, as he alone decided how many tainted prescriptions he would write, how extensive the geographic scope of his prescribing and patient base would be, and how many pharmacies and pharmacists he would work with.

  - Further, and most critically, Seth did not exercise meaningful "control and authority" over others. He certainly did not control or direct Physician-1 in any respect, and instead was expected to follow Physician-1's directions and implement Physician-1's plans. Seth also did not control or have authority over the pharmacists who participated in the scheme, because while those pharmacists were dependent on the receipt of prescriptions in order to fund their kickback payments, the pharmacists could have withdrawn from the scheme at any time, could have refused to pay Physician-1 the kickbacks he demanded, and ultimately answered to and were dependent entirely upon Physician-1. In fact, given that it was Physician-1 alone who could write prescriptions and choose which

pharmacists to work with, Seth had little ability to control or influence the conduct of the pharmacists, and little authority over their actions.

For the foregoing reasons, we submit that the aggravating role enhancement under § 3B1.1 does not apply in this case, and that the advisory Guidelines range is 37 months to 46 months.

## SENTENCING ARGUMENT

### A Sentence Well Below the Advisory Guidelines Range is Warranted in This Case Pursuant to the Factors Enumerated in § 3553(a)

### I.   Legal Framework.

Pursuant to the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220, 245 (2005), the Sentencing Guidelines are advisory.  Although "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," the Guidelines are merely the "starting point and the initial benchmark . . . ."  *Gall v. United States*, 552 U.S. 38, 49 (2007) (internal citations and quotations omitted). Indeed, after determining the Guidelines, the Court must "consider all of the § 3553(a) factors" and "make an individualized assessment based on the facts presented." *Id.* at 49-50; *see also United States v. Montes-Pineda,* 445 F.3d 375, 378 (4th Cir. 2006) (noting that "the applicable Guidelines range is only one factor that sentencing courts must consider in imposing a proper sentence").  The Court must "impose a sentence sufficient, *but not greater than necessary*, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a) (emphasis added).

Section 3553 directs courts to impose the minimum sentence necessary (a) "to reflect the seriousness of the offense, to promote respect for the law, and provide just punishment for the offense"; (b) "to afford adequate deterrence to criminal conduct"; (c) "to protect the public from further crimes of the defendant"; and (d) "to provide the defendant with needed educational or

vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2). In addition, § 3553(a) directs the Court to consider "the nature and circumstances of the offense and the history and characteristics of the defendant"; "the kinds of sentences available"; the Guidelines and any relevant policy statements; "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"; and the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a)(1), (3)-(7).

## II.    Application of the § 3553(a) Factors.

### A.    The Nature and Circumstances of the Offense

As he has indicated repeatedly to his family and friends, has stated in his sentencing letter, and will advise the Court during his upcoming sentencing, Seth blames only himself for his involvement in this scheme. He knew what he was doing was wrong, he engaged in illegal conduct of his own volition, and he in no way seeks to minimize the nature of his actions. Instead, every single day Seth deeply regrets having become involved, and he suffers the unrelenting mental anguish that comes from knowing how he has harmed his family and put their well-being at risk. Further, Seth knows that by conspiring with Physician-1 to solicit and receive kickbacks from pharmacies in return for the prescriptions that Physician-1 was writing, the offense conduct undermined the integrity of the health care system, created the potential risk of unnecessary or overly expensive prescriptions, and also generated a risk (albeit unrealized) of patient harm.

As important as it is to acknowledge what Seth's conduct was, however, it is equally important to recognize what that conduct was not. As the PSR and the stipulated Statement of Facts reflect, Seth was directed by Physician-1 in nearly every action he undertook in furtherance

18

of the scheme, and Seth's role was frequently that of a go-between for Physician-1 and the pharmacists who were paying kickbacks in exchange for the referral of Physician-1's prescriptions.  Seth does not in any way seek to dispute his knowing participation in the illegal acts in this case, nor does he deny or minimize the seriousness of the offense conduct of which he was part.  And yet it is still worth recognizing that, when Seth was conspiring with Physician-1, he did so as an employee, rather than as someone who received a direct share of the proceeds of the offense.  It is also worth noting that, as a salaried employee, Seth did not benefit from an increase in the number of prescriptions that were issued, nor did he benefit from Physician-1's frequent demands for a greater share of the reimbursements that the pharmacists received.  Similarly notable is that Seth's role in the scheme was not essential or irreplaceable, since he was neither writing the prescriptions, filling them, nor determining the compounded formulations that would generate the largest amounts in government reimbursements.  In fact, while important, Seth's role was ultimately fungible, as Physician-1 demonstrated by eventually terminating Seth's employment.

In considering the nature and circumstances of the offense, it also bears mentioning that whereas the Government initially sought restitution from Seth in the amount of $4,832,591.35, that number has now dropped to $583,480.40.  As it has indicated, the Government reduced this amount because its evidence does not show that the majority of prescriptions were unnecessary, were prescribed by someone other than a licensed physician, or were not in fact provided to a beneficiary.  In other words, the offense in this case is distinguishable from many other government health care schemes in which there is a significantly higher percentage of loss. Thus, while Seth's offense is undoubtedly serious, it is not among the egregious types of health care frauds for which criminal sanctions are and should be most severe.

**B.      Seth And His Family Have Suffered Significant Consequences Due
to His Conduct.**

As we have indicated, Seth understands that he is appearing before your Honor because
of decisions that he, and he alone, made.  He is deeply ashamed of his conduct and has accepted
full responsibility for his actions.  At the earliest moment after being approached by law
enforcement, Seth participated in lengthy interviews with the Government, provided the
Government with all of the information he possessed regarding the offense, and admitted his
participation in the conspiracy charged.

Seth knows he will need to spend the rest of his life making this situation right to his
family, his community, and his country.  And just as his family leaned on Seth over the years for
support and guidance, so now will he rely upon them for forgiveness, support, and love.  But the
family unit as Seth knew it before he made these terrible choices has already been shattered.  As
Timothy Jozwiak, a friend of Seth's for over 15 years, writes in his letter to the Court, "I have
seen the stress that he has been working under and the effect it is having with his
marriage."  Ex. F.  In fact, Seth's marriage may well be at its breaking point.  Although Seth's
wife Marley has been supportive of Seth since his guilty plea, Marley notes in her letter that it
has been a "difficult and heart-wrenching time," and she and Seth are actively exploring
divorce.  Ex. D.  Seth's sister Robin has expressed this marital collapse in similar terms, writing
that Seth's guilty plea has led to the couple's separation and has "completely disrupted the
family's life."  Ex. B.

As much as Seth's conduct has harmed his relationship with his wife Marley, that marital
harm does not come close to the harm Seth's actions will visit upon his two sons.  As Seth's
sister Robin writes in her letter to the Court: "His twin 18-year-old sons, Cole and Connor, do
not yet know of the case, but they have had their lives completely unsettled due to COVID. . . . It

would also cause great emotional pain for his children, creating even greater disruption than they experienced the past several months." Ex. B. Marley puts it even more starkly, stating that she "fear[s] what Seth being sent to prison will do to our children. They have always had their father in their lives and are hard-working, upstanding members of society." Ex. D.

 And Seth's friend Joan Dwoskin describes in her letter the devastating impact that Seth's potential incarceration would have on both his sons and his relationship with his wife, writing that:

> Seth's arrest and guilty plea have strained his marriage with Marley, and he is so ashamed of his actions that he has not told his sons about them. It hurts my heart to write these words because I know how much Marley and the twins mean to him. If his punishment leads to time away from his family, it could break their spirit, and I am afraid it could lead to divorce.

Ex. C.

Beyond this emotional toll, Seth has been the family's sole source of income for the past 19 years, and his conduct has now placed his family on the financial brink. As Marley writes, the boys require "their father's financial support to survive," and Seth's incarceration could cause them "to lose the roof over [their] heads, [their] health insurance, and the boys' complete sense of security▪▪▪▪▪▪▪▪ Ex. D. Moreover, in many ways all Seth has worked for is gone. His future employment prospects will be dramatically limited as a result of his felony conviction in this case, and he will owe the Government a combined total of over $1 million in

restitution and forfeiture.  The impact here can hardly be understated.  As Seth's friend and colleague Timothy Jozwiak writes: "Providing a home for his family is paramount for Seth.  The fear that he would not be able to provide for his family is what keeps Seth awake at night."  Ex. F.

### C.    Seth Has Made Meaningful Positive Changes in His Life

In part because of the harm he has caused to his family and others, Seth is fully committed to atoning for his actions.  He has publicly admitted his guilt and discussed his misconduct with those who love him deeply, knowing that these are essential first steps in ultimately restoring integrity and value to his life.

The sentencing letters that family and friends have submitted on Seth's behalf uniformly comment not only on Seth's remorse, but also on his efforts to grapple with the seriousness of the conduct that has led him to this point.  Seth's sister Robin, for example, writes that Seth has discussed with her "the legal issues he has been facing throughout this ordeal," and that he feels "deep regret for allowing his friendship [with Physician-1] at the time to cloud his judgment and realizes that that he should have made different decisions."  Ex. B.  Marley also discusses Seth's contrition, noting that she has "seen Seth's sincere regret and remorse for his conduct," and that Seth "mentions almost daily the hard, painful lessons he has learned."  Ex. D.  Friend Joan Dwoskin also writes that rather than make excuses for his wrongdoing, "Seth has expressed remorse about his poor judgment in deciding to participate in the events that led to his plea." Ex. C.  Joan also recounts in her letter that, based on her discussions with Seth, "he understands the gravity of his actions," "is called to change the course of his life," and "is no longer driven by the goal of making money; rather, he is focused on being a good husband, father, brother, friend and citizen."

The shame of having caused so much hardship to his loved ones has strengthened Seth's resolve to improve himself, and has motivated his ongoing efforts to bring about positive change. At various points in life Seth has participated in therapy, but in October 2019, Seth recommitted himself to therapy as part of an effort to understand and address the conduct that brings him here. He started attending weekly psychotherapy sessions with his therapist, Steven Wodka PsyD.  Dr. Wodka has observed first-hand Seth's efforts and his progress, advising the Probation Department that Seth has "worked diligently in therapy to overcome [his] difficulties" and to "develop[] insights into his hurt and pain."  PSR ¶ 111.

Marley, too, indicates in her letter to the Court that she is "proud" of Seth for "taking, sometimes very painful, steps to becoming a better human for the sake of himself, his community, and his family."  Ex. D.  Marley also writes that Seth now "understands what is important in life – family and making a difference in other's lives by giving back[.]" Seth has also spent as much time as possible with his two boys, helping them adapt to COVID-19, the changes in life that come with entering into adulthood, and the enormous stresses they face. Indeed, the prospect of being separated from his children due to his own conduct has clarified for Seth what truly matters in life.  As Marley puts it, Seth "does not take our family for granted and invests his time in therapy to be a better human and father."

The circumstances of this case also have awakened Seth to a new set of priorities within his community at large.  After he received the Target Letter in this matter, and throughout the time period in which he was conferring with the Government while also working multiple jobs, Seth remained actively involved within his community.  He particularly enjoys fostering dogs and volunteering at the animal shelter where he walks and plays with abandoned dogs.  Seth's friend Timothy Jozwiak notes in his sentencing letter that after the passing of Wilson, the Myers

family's Doberman, Timothy introduced Seth to Illinois Doberman Rescue.  Ex. F.  Timothy writes that "fostering a dog had a strong effect on Seth. That experience led him to volunteering at another pet shelter. He still spends a couple of hours each week helping at the shelter."  Seth's sister Jane also writes that Seth "enjoys the time he volunteers at an animal shelter walking the dogs.  He hopes that by taking the time to spend with the dogs they can be adopted into a forever home."  Ex. E.

A lifelong lover of books, especially spy thrillers, Seth also began volunteering at the local library, and until COVID he helped organize the shelves and stow away the returned books. Seth has volunteered at the Crystal Lake Food Pantry as well, where he assists in organizing the food for distribution to the needy during the pandemic. In these ways, Seth decided that he would no longer live detached from his neighbors, without meaningful connections to others and without helping those less fortunate. As Marley writes, she sees a "marked difference" in Seth and the "support he brings to [their] community."  Ex. D.  Robin echoes this sentiment in her letter stating, that "[w]hile [Seth] feels deeply remorseful for the choices he made, he also believes that he has a lot to learn from this experience," and that he has "focused on making amends and giving back to his community as he moves forward."  Ex. B.

### D.    Seth's Conduct Was Inconsistent with His Otherwise Law-Abiding Life

Seth – who has no criminal history, no meaningful substance abuse history, and no prior experience with the criminal justice system whatsoever – is not a threat to society. The conduct to which Seth pleaded guilty, as those know him well have explained, is inconsistent with his character and represents a marked deviation from the path he has otherwise followed. Of course, Seth recognizes that his conduct with Physician-1 was shameful and illegal, and he has therefore been focused over the last two years on demonstrating his respect for the law and reaffirming his

genuine commitment to living a law-abiding life.  Moreover, despite Seth's conduct leading up to this case, the letters submitted by Seth's family and friends describe a man who has long been committed to honesty and integrity.  Not surprisingly, then, Seth's family see the current situation as out of character. As Seth's sister Jane puts it, for example, "Seth has always been an honest, caring person.  When he tells you he will do something, you can count on him and take him at his word."  Ex. E.

As the last two years have demonstrated, Seth is committed to doing everything in his power to maintain legitimate employment, provide financial security for his family, and contribute to society through hard work and effort.  As his sister Robin writes, "Seth has always been extremely hardworking," Ex. B, and the specific jobs Seth has held during the pendency of this case confirms that assessment.  Seth maintained his full-time employment with a factoring company, Pine Street Capital, LLC, from January 2019 through January 2021. Although financial distress related to the pandemic has caused the company to wind down, Seth has continued working part-time for Pine Street Capital, and the company compensates him solely by covering the cost of his health insurance.

Seth has also been able to remain gainfully employed during the pandemic through part-time work and a separate consulting project.  In particular, in October 2020, Seth started working around 20 hours per week (mostly on weekends) in the cheese department at Mariano's, a fresh food market in his town of Crystal Lake, Illinois.  Seth also began working in February 2021 as a management consultant for Brayco, a company based in Abilene, Texas that sells promotional products such as apparel, signage, pens, and other items that are customized with corporate logos.

25

This work for Brayco and the food market has allowed Seth to set aside a modest sum for his wife and children if he is required to serve a period of incarceration, and reflects Seth's overriding concern for the impact his case will have on his family.  Indeed, while other defendants in Seth's shoes may have wallowed in their situation, Seth refused to do so.  He kept his head down and remained gainfully employed during the worst economic downturn in a nearly a century, all to provide for the family that means so much to him.

### E.    Considerations of Deterrence

A sentence of incarceration in this matter is not necessary to deter Seth from future misconduct, and there is no realistic chance that Seth will ever again violate the law.  Seth has been personally deterred by the devastating consequences he has faced during the last two years: the destruction of his marriage; the humiliation and reputational harm from his conviction; the impact on his career and financial prospects; and the knowledge that his sons will forever associate him with illegality.  Additionally, Seth has already demonstrated substantial rehabilitation: he has contributed to the well-being of his community, has assessed in therapy the source of his conduct, has done everything in his power to atone for his actions, and is working multiple legitimate jobs. The harms Seth has brought upon his family, which cause him pain and suffering every day, are more than sufficient to ensure that he will never reoffend.

As for general deterrence, the public would not view a below-Guidelines sentence for Seth and say that he has not been duly punished.  The financial penalties in this case, the reputational and emotional harm suffered by Seth and his family, the collapse of his marriage, and ███████████████████████████████████████████ – all of these are more than enough to warn others from even considering engaging in the same type of conduct that Seth has forthrightly admitted.

26

F.      **The Avoidance of Unwarranted Sentencing Disparities**

A final relevant sentencing factor that requires consideration under § 3553(a), and that warrants brief discussion here, is the avoidance of unwarranted sentencing disparities.

In assessing the type of sentence in this case that would avoid unwarranted sentencing disparities, we note at the outset that, unlike the Court, we are not privy to all of the detailed facts and circumstances that led to the Court's recent sentencing decision as to Michael Beatty, who was a member of the same conspiracy in which Seth also participated.  We also acknowledge that there are points of divergence between the offense conduct at issue in these two cases, and that the degree of impact those divergences should have on Seth's sentence is not always clear. We recognize, for example, that Seth's participation in the conspiracy continued for a longer period of time than that of Mr. Beatty, that Seth was employed by the physician who was at the center of the conspiracy, and that due to the foregoing two factors, the § 2B1.1 enhancement for Seth is greater than it was for Mr. Beatty.  On the other side of the coin, we note that unlike Mr. Beatty, did not use any specialized skill or knowledge to carry out the scheme, Seth did not abuse a position of trust in the health care system, and was compensated only through a fixed salary rather than through a share of the reimbursements generated by the offense.

The personal circumstances between Mr. Beatty and Seth are also comparable, and in some ways appear to weigh slightly in Seth's favor.  It appears, for example, that Mr. Beatty, like Seth, promptly acknowledged his criminal conduct and has taken all possible steps to mitigate the impact of his actions.  It likewise appears that Mr. Beatty, like Seth, has donated his time and effort to volunteer organization in his community; has enormous regret for his conduct; and has remained gainfully and legitimately employed since the offense conduct ended.  In a point of distinction, though, the sentencing information available to us does not suggest that Mr. Beatty's

ex-wife or their child are entirely dependent on Mr. Beatty for their financial well-being, whereas Seth's wife Marley is not working and has long depended entirely on Seth for her financial survival. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████

In sum, and as noted, we do not presume to know all of the relevant circumstances necessary to prevent unwarranted disparities from arising in these related cases, nor are we called upon to conduct the delicate balancing that rests in the sound discretion of the Court.  We nonetheless observe that the year-and-a-day sentence imposed in Mr. Beatty's case represented a substantial downward variance from the Government's 30-month recommendation, and to the full extent possible, we respectfully request a similarly substantial downward variance from the Government's 36-month recommendation for Seth.

## CONCLUSION

Seth Myers has undoubtedly committed a serious crime, for which he promptly and fully accepted responsibility. He has demonstrated remorse for his conduct and taken positive, meaningful steps to improve his life.  He struggles every day with the pain and suffering he has caused his loved ones, and with the shame he has brought upon himself. Seth will never again engage in the type of conduct that has brought him before this Court, and the destruction of his family life and career will serve as more than adequate deterrence for anyone contemplating the type of conduct in which Seth engaged.  Moreover, Seth and his family have already endured a great deal as a result of Seth's actions, and while Seth knows there is substantial price to be paid

for the type of conduct in which he engaged, he and his wife ███████████████ ████████████ in the event a lengthy period of incarceration were to be imposed.

For these and the other reasons set forth above, we respectfully request that your Honor impose a below-Guidelines sentence that is as lenient as possible under the circumstances presented.

Dated: March 15, 2021

Respectfully submitted,
Seth Michael Myers
By Counsel


By: /s/ Brian W. Stolarz
Brian W. Stolarz (#88176)
Fox Rothschild LLP
1030 15th Street NW Suite 380
Washington, DC 20005
Phone: (202) 794-1224
Facsimile: (202) 461-3102
bstolarz@foxrothschild.com


By: /s/ Robert M. Radick
Robert M. Radick
Morvillo Abramowitz
Grand Iason & Anello PC
565 Fifth Avenue
New York, NY 10017
Phone: (212) 856-9600
Facsimile: (212) 856-9494
rradick@maglaw.com

*Attorneys for Seth Michael Myers*